# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
### No. 18-88V
UNPUBLISHED

|  |  |
|---|---|
| JENNIFER ROBINSON,<br><br>     Petitioner,<br><br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>     Respondent. | Chief Special Master Corcoran<br><br>Filed: August 27, 2020<br><br>Special Processing Unit (SPU);<br>Decision Awarding Damages; Pain<br>and Suffering; Influenza (Flu)<br>Vaccine; Guillain-Barre Syndrome<br>(GBS) |

*Isaiah Richard Kalinowski, Maglio Christopher & Toale, PA, Washington, DC, for petitioner.*

*Heather Lynn Pearlman, U.S. Department of Justice, Washington, DC, for respondent.*

## DECISION AWARDING DAMAGES[1]

On January 18, 2018, Jennifer Robinson filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered from Guillain-Barré syndrome ("GBS") as a result of influenza ("flu") and Tetanus Diphtheria acellular Pertussis ("Tdap") vaccines administered on August 31, 2015. Petition at 1-6. The case was assigned to the Special Processing Unit of the Office of Special Masters.

For the reasons described below, I find that Petitioner is entitled to an award of damages in the amount **$165,113.59**, **representing** $**160,000.00 for actual pain and**

---

[1] Because this unpublished decision contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002.  44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services).  **This means the decision will be available to anyone with access to the internet.**  In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755.  Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

suffering, **$2,428.94 for past unreimbursable expenses, and $2,684.65 in lost wages.**

## I.     Relevant Procedural History

Petitioner filed her case on January 18, 2018, with Respondent conceding entitlement on April 1, 2019. ECF No. 33. After six months of negotiating on the amount of Petitioner's damages, Respondent indicated the parties had reached an impasse and requested that damages be resolved through briefing. *See* Status Report, dated October 9, 2019, ECF No. 53. At a subsequent status conference on November 22, 2019, the parties reported they had agreed on the amount of unreimbursable expenses, but still disagreed on the amount of pain and suffering damages and on whether lost wages should be awarded. I ordered the parties to file briefs to be considered in a decision awarding compensation. ECF No. 54.

Petitioner submitted lost earnings documentation on January 9, 2020, and a motion for a ruling on the record (with supporting memorandum) regarding damages on January 10, 2020. Motion for Findings of Fact and Conclusions of Law Regarding Damages and Petitioner's Memorandum ("Motion"), ECF Nos. 56, 57. Respondent filed a response brief on damages on February 24, 2020 and Petitioner replied on April 21, 2020.  Respondent's Brief on Damages ("Response"), Petitioner's Reply Memorandum ("Reply"), ECF Nos. 59, 60.

After reviewing the parties' briefs, I ordered Petitioner to provide additional documentation supporting her wage loss claim. ECF No. 62. Petitioner complied, and subsequently revised her claim with the parties ultimately agreeing that Petitioner should be awarded past lost wages in the amount of $2,684.65. ECF Nos. 63, 64, 66.

All this leaves is resolution of Petitioner's pain and suffering damages.

## II.     Relevant Medical History

Petitioner was 41 years old and working as an administrative assistant at Wal-Mart when, on August 31, 2015, she received two vaccines at her annual exam with her primary care provider ("PCP"). Petitioner's Exhibit ("Ex.") 2 at 40. Specifically, she received a flu vaccine in her left arm and Tdap in her right arm. Ex. 1 at 2-3. At that time, she was in good health, seeing her PCP for an exam every year and for occasional respiratory symptoms due to a cold or allergies. Ex. 2 at 48-83.

On September 14, 2015, Petitioner returned to her PCP complaining of headache, numbness in hands and arms, lack of taste, and vision changes that had started two days

prior. Ex. 2 at 34. Her doctor noted her "odd complaints" and diagnosed her with tension-type headache and paresthesias (unspecified disturbances of skin sensation). *Id*. at 34, 36. He recommended an MRI of the brain and a steroid pack. *Id*. at 35.

Petitioner's condition worsened and she went to the emergency department two days later with numbness in her arms and legs, pain between her shoulder blades, headaches, and intermittent blurred vision. Ex. 7 at 788. The ER physician noted Petitioner was scheduled for an MRI and evaluated her for a stroke, but a head CT, chest x-ray, and EKG showed negative results. *Id*. at 788-791. She was discharged with diagnoses of sinus headache and paresthesias and instructed to continue with the scheduled MRI the next day. *Id*. at 791-792, 794.

The MRI performed on September 17, 2015, revealed findings described in the report as "[t]wo very subtle subcentimeter white matter FLAIR hyperintensities in the frontal lobe corona radiata, nonspecific, statistically favored to represent chronic small vessel ischemic change, can also be seen with sequela of chronic migraine or demyelinating disease, considered less likely." Ex. 7 at 72. The next day Petitioner returned to the hospital reporting continued blurry vision, numbness in upper and lower extremities, and alteration of taste. *Id*. at 109. The steroid pack previously prescribed by her PCP had reduced her headache, but her vision was worsening, and she was experiencing severe back pain with nausea and vomiting. *Id*. at 109-110, 209. She was admitted for evaluation for GBS in light of her recent vaccinations. *Id*. at 209-210.

Petitioner was admitted on September 18, 2015, and spent six days in the hospital. Ex. 7 at 209. A lumbar puncture was attempted the second day, but it was unsuccessful. *Id*. at 209, 249.  Since Petitioner's symptoms were worsening, the medical team decided to start IVIG then attempt another lumbar puncture afterwards to confirm a GBS diagnosis. *Id*. Her numbness ascended upwards, she began vomiting and was moved to the ICU on September 20, 2015. *Id*. at 245. Once in the ICU, a successful lumbar puncture confirmed that she had acute inflammatory demyelinating polyneuropathy. *Id*. at 240.

Although Petitioner's condition began to stabilize upon the second and third rounds of IVIG, she experienced an episode of positional tachycardia raising concerns of a pulmonary embolism ("PE"). *Id*. at 237, 240. The tachycardia persisted but a scan showed no evidence of PE. *Id*. By September 23, 2015, Petitioner was regaining some sensations and could taste food again, but she was reporting a lot of back pain. *Id*. at 230. Petitioner completed five rounds of IVIG during the hospitalization and she was discharged on September 24, 2015 with instructions to follow up with a neurologist in ten days. *Id*. at 112.

3

Petitioner returned to her PCP on September 28, 2015, who noted her recent hospitalization with GBS and sinus tachycardia diagnoses. Ex. 2 at 30. Petitioner described increased heart rate when she moved and told her PCP that the hospital did not continue her medications upon discharge. *Id*. The doctor noted that Petitioner is afraid to go to physical therapy ("PT") due to concerns about her heart rate and he prescribed a beta blocker. *Id*.

On October 5, 2015, Petitioner started PT to address multiple muscle weaknesses, abnormal paresthesias, and increased pain levels. Ex. 3 at 54. Petitioner's range of motion ("ROM") of her arms and legs was limited with decreased strength in her extremities. *Id*. at 54-55.

Petitioner followed up with neurologist Jose Matus, M.D. on October 9, 2015 who confirmed that it was highly possible that the flu vaccine triggered Petitioner's GBS. Ex. 3 at 16. Dr. Matus examined Petitioner and noted she had slight decreased sensation in her upper and lower limbs with tingling in her hands and feet. *Id*. Dr. Matus completed a disability and leave form for Petitioner on October 15, 2015, indicating that she was unable to work from September 18, 2015 to December 9, 2015. *Id*. at 90.

Over the next three months, Petitioner attended 20 sessions of PT and regained her ROM and strength although she continued to report right shoulder pain. She was discharged to a home exercise program on December 29, 2015. Ex. 3 at 47. She returned to Dr. Matus on December 8, 2015, who recorded that Petitioner was improved but still had some tingling in her hands and feet. She had stopped the medication for her heart rate and noticed no issues. *Id*. at 10. Dr. Matus certified that Petitioner could return to work with no restrictions on December 9, 2015. *Id*. at 84.

Petitioner continued to follow up with Dr. Matus at six-month intervals, then on a yearly basis, and now as needed. Ex. 3 at 3; Ex. 8 at 2, 5; Ex. 16 at 2. She reported residual numbness and tingling in her hands and feet at her last visit on October 22, 2018, but it was not interfering with balance or walking. Ex. 16 at 2-4.

### III.    Affidavits

Petitioner submitted two affidavits with detailed descriptions of falling ill and recovering from GBS. Exs. 9, 11. She was an active wife and mother of two with a full-time job when she was vaccinated on August 31, 2015, and she described the experience of GBS as devastating and life-changing. Ex. 11 at 1.

Petitioner's illness started on September 10, 2015, with headaches leading to numbness in both hands with an extreme sensitivity to cold. *Id*. at 2. Over the next few

days, she described her tongue and mouth becoming numb and everything she ate or drank tasted bad. *Id*. at 3. Her vision blurred and she could not read the words on the bottle of Excedrin she was using for the headaches. *Id*. Petitioner reviewed the strange symptoms with her PCP leading him to suspect neurological problems and scheduling her for an MRI. *Id*.

Petitioner's next symptom was pain in her upper back that interfered with sleep and work. Ex. 11 at 3-4. The numbness spread down to her lower legs and feet and her vision worsened so Petitioner decided to go to the emergency room on September 16, 2015, even though her MRI appointment was the next day. *Id*. at 4. She was checked for a possible stroke and when her tests turned up negative, she was discharged with no idea what was wrong. *Id*.

Over the next several days, Petitioner's symptoms intensified as did her frustration and concern. Ex. 11 at 5-6. She returned to the emergency department on September 18, 2015, and saw a neurologist who was initially dismissive of her symptoms, attributing her vision problems to age and the numbness to possible diabetes. *Id*. at 6. She described his demeanor changing when he learned she had a flu shot two weeks before the start of her symptoms. *Id*. at 7. Petitioner learned she would be admitted immediately and would need a lumbar puncture to determine if she had GBS. *Id*.

Petitioner described confusion and horrible pain during the first couple days of the hospitalization. Ex. 11 at 7. The lumbar puncture was first delayed (due to her recent ingestion of aspirin) then the doctor was unsuccessful in reaching spinal fluid even after an hour of trying so her diagnosis remained uncertain. *Id*. at 7-8. Due to her rapid deterioration, the doctor suggested she start IVIG treatment anyway and she agreed. *Id*.

On September 20, 2015, Petitioner awoke to find the numbness had progressed to her chest and she could not catch her breath. Ex. 11 at 9. Petitioner was vomiting and sweating profusely, and she was aware that her medical team was very concerned. *Id*. Petitioner was transferred to the ICU and informed she might need to be placed on a ventilator. *Id*. at 9. She recalled in her affidavit that she had never been so scared in her life. *Id*.

Although a successful lumbar puncture in the ICU confirmed the GBS diagnosis, Petitioner experienced migraines as a side effect. Ex. 11 at 10. She described the migraines as so severe she was "continually vomiting, screaming, crying." *Id*. On the second day in the ICU, her blood pressure was elevated, and her heart rate increased whenever she tried to sit up. *Id*. at 11. She underwent more painful testing for the spiking heart rate and blood clotting abnormalities. *Id*.

The five IVIG treatments caused Petitioner to regain sensation in her chest and waist and she was moved out of the ICU to a regular room on September 23, 2015. Ex. at 11 at 11. However, the pain in her back was still severe and she could not walk without assistance, so she was shocked the next day to learn she was being discharged. *Id.* at 12. She was further distressed when she was discharged with an order for physical therapy and the surprising offer of a flu shot but no medications for either the pain or her racing heart rate. *Id*.

Petitioner described a "horrible" return home from the hospital with her heart racing every time she stood up and a sleepless night with pain, nausea, vomiting, headaches, and cold sweats. Ex. 11 at 12. She made an appointment to see her PCP and her husband helped her into the doctor's office the next day. *Id*. at 13. Her PCP was surprised she was sent home without prescriptions and he prescribed a heart medication and something for the pain. *Id*. The doctor told her she had a hard recovery ahead of her and would be out of work for several months. *Id*.

Petitioner required PT to regain use of her right arm and address her atrophied leg muscles. Ex. 11 at 13. She participated in PT for about three months then was discharged to a home exercise program. *Id*. She discontinued the heart medication after a couple months and her blood pressure and heart rate remained stable. *Id*. During her months of recovery she was unable to attend her children's school activities. *Id* at 1-2.

In her affidavits Petitioner described the illness and its residual effects taking a physical and mental toll on her. She has continued to have weakness, numbness, shooting nerve pain in her legs and arms, and balance problems. Her neurologist is uncertain whether the symptoms will ever completely resolve. Ex. 11 at 13-14. The emotional effects were also significant because she was fearful that she would not survive, and she feels guilty about the strain of her illness and recovery on her husband and children. *Id*.

Petitioner's husband, Ben Robinson, also submitted an affidavit in connection with this case. Ex. 12. He described how Petitioner's illness disrupted family life and negatively affected his job performance. *Id*. at 1-3.

## IV.    The Parties' Arguments

As already noted, the parties agree that Petitioner should be awarded $2,428.94 in unreimbursed expenses, and $2,684.65 in past lost wages but disagree on the amount of pain and suffering damages.

Petitioner suggests she should be awarded $180,00.00 in damages for pain and suffering. She compares her circumstances to that of two previous GBS petitioners who received a comparable pain and suffering award. *See Johnson v. Sec'y of HHS*, No. 16-1356V, 2018 WL 5024012, at *2-4 (Fed. Cl. Spec. Mstr. July 20, 2018) (awarding $180,000.00 to petitioner); *Dillenbeck v. Sec'y of HHS*, No 17-428V, 2019 WL 4072069, at *2 (Fed. Cl. Spec. Mstr. July 29, 2019), *aff'd in relevant part,* 147 Fed. Cl. 131 (2020) (awarding $180,857.15 to petitioner). She emphasizes that her claim for pain and suffering and emotional distress is well supported by the testimonial affidavits and documented in medical records. Motion at 12.

Respondent also compares Petitioner to the petitioners in *Dillenbeck* and *Johnson,* but argues that Petitioner suffered less than those petitioners, and is thus more appropriately compensated with an award of $120,000.00.

## V.   Analysis

### A.  Pain and Suffering

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Human Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed.

Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with my predecessor Special Masters) adjudicating similar claims. *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

In this case, Petitioner was a busy wife and mother when she incurred GBS as the result of her flu vaccination. She experienced a range of puzzling and distressing symptoms that her doctors were initially unable to diagnose as her condition deteriorated. Her six-day hospitalization was a baffling ordeal that caused her to question whether she would survive or not. However, once she was diagnosed and properly treated, her condition responded dramatically. And, although she had a challenging recovery period, she was back to work roughly three months after the hospitalization with no limitations, and her ongoing sequelae are relatively mild.

Both parties compare Petitioner's case to two previously decided GBS cases, *Johnson* and *Dillenbeck,* so some discussion of their holdings is in order. The *Johnson* petitioner was awarded $180,000.00 in past pain and suffering, and in *Dillenbeck* I awarded the petitioner $170,000.00 in past pain and suffering and $500.00 per year in future pain and suffering, for a total award of $180,857.15. Like Ms. Robinson, those petitioners suffered through a course of illness involving a sudden onset of strange symptoms, hospitalization with repeated courses of IVIG, and a brisk subsequent response to treatment. Ms. Dillenbeck spent two weeks in the hospital, while Ms. Johnson was hospitalized for five days. Those petitioners also suffered continuing symptoms like Petitioner that included gait problems, general weakness, and numbness in the extremities.

Unlike the instant case, however, the *Johnson* and *Dillenbeck* petitioners experienced other knock-on effects of their GBS that cast a more significant shadow over their enjoyment of life. Ms. Johnson and Ms. Dillenbeck were unable to resume activities and return to work in the same capacity as before the illness. Continuing fatigue interfered with Ms. Johnson's ability to work as a school librarian and bus driver, requiring her to return home in the middle of the day to rest. *Johnson,* 2018 WL 5024012, at *7.

Furthermore, Ms. Johnson suffered with incontinence as a distressing residual symptom of GBS. *Id.* at *5. The *Dillenbeck* petitioner was unable to continue as a veterinary technician due, in part, to her GBS sequelae, and I expressly took into account the petitioner's distress arising from lost vocational opportunities in calculating pain and suffering in that case. *Dillenbeck,* 2019 WL 4072069, at *4. I noted in that decision that it was a generous award but consistent with other Program cases involving GBS injuries that resolved favorably (with mild to moderate sequelae). *Id.* at *14-15.

Petitioner stresses that her hospitalization and recovery interfered with her ability to parent her children, a factor considered in past damages decisions - but absent from *Johnson* and *Dillenbeck*. Motion at 9. Petitioner's emotional distress in the hospital was complicated by her worry for her family and she was unable to fully participate in her children's activities for a period of months afterward. Respondent, on the other hand, does not address Petitioner's family concerns at all, and instead focuses on the short hospitalization and quick recovery with few residuals to argue that Petitioner should be awarded a lesser amount than in *Johnson* and *Dillenbeck*. However, Petitioner had no way to know that her illness would be brief, and her sequelae relatively mild when she was struggling to breathe in the hospital and questioning her own survival. Both she and her husband had to curtail family activities while she recovered although she was fortunate that she has not experienced ongoing activity limitations like Ms. Johnson and Ms. Dillenbeck. Thus, while this factor does not quite support an award as high as allowed in the two comparable cases, it is worthy of consideration.

After considering the entirety of the record, including both of Petitioner's affidavits which I find credible and consistent with the medical records, I award her $**160,000.00** in past pain and suffering. I do not find that this case presents quite as severe a situation as *Dillenbeck* or *Johnsoni,* but also believe that Petitioner has made out a persuasive case for an above-median award that reflects Petitioner's established suffering.

## VI.   Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **I find that $160,000.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering.[3] I also find that Petitioner is entitled to $2,428.94 in actual unreimbursable expenses and $2,684.65 in lost wages.**

---

[3] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required.  *See* § 15(f)(4)(A); *Childers v. Sec'y of Health & Human Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Human Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

Based on the record as a whole and arguments of the parties, **I award Petitioner a lump sum payment of $165,113.59 in the form of a check payable to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a).

The Clerk of the Court is directed to enter judgment in accordance with this decision.[4]

**IT IS SO ORDERED.**

<u>**s/Brian H. Corcoran**</u>
Brian H. Corcoran
Chief Special Master

---

[4] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.